# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| SAMUEL ADAM COX, III | ) | Civil Action No. 08-cv-2832-BBD-tmp |
| | ) | |
| Plaintiff-Relator, | ) | |
| v. | ) | |
| | ) | |
| SMITH & NEPHEW INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## PLAINTIFF-RELATOR'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Of Counsel:

David W. Sanford, D.C. Bar No. 457933
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7777
Facsimile: (202) 742-7776
Email: dsanford@swhlegal.com

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT MORRIS**
1666 Connecticut Ave., NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776
Email: grantemorris@gmail.com

H. Vincent McKnight
**MCKNIGHT & KENNEDY, LLC**
8601 Georgia Avenue, Suite 1010
Silver Spring, MD 20910
Telephone: (301) 565-5281
Facsimile: (301) 565-5285
Email: vmcknight@mcknightandkennedy.com

Kevin H. Sharp
**DRESCHER & SHARP, PC**
1720 West End Ave., Ste. 300
Nashville, TN 37212

DATED: June 16, 2010

## I.     INTRODUCTION

Plaintiff-Relator Samuel Cox, a former executive level employee at Defendant Smith & Nephew, Inc. (hereinafter "Defendant," "S&N" or "the Company"), alleges in his First Amended Complaint (hereinafter "Complaint") that Defendant violated the Federal False Claims Act, 31 U.S.C. §3729, *et. seq.* (hereinafter "FCA"). Specifically, Mr. Cox's Complaint alleges that, since at least 2003, Defendant has been knowingly and willfully selling Malaysian-made medical supplies to the United States Government in violation of the Trade Agreements Act (hereinafter "TAA"), 19 U.S.C. 2501, *et seq.*, while falsely certifying that those supplies were in fact manufactured in the United States. (Compl. ¶ ¶ 79-88) In so doing, Defendant has knowingly presented, and continues to present, false claims for payment to the United States Government in violation of 31 U.S.C. §3729 (a)(1)(A). (Compl. ¶ ¶ 79-83)  Defendant has also knowingly made, and continues to make, false statements to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B). (Compl. ¶ ¶ 84-88) In continuing to knowingly and willfully perpetrate this scheme to defraud the U.S. Government through its false claims and statements, Defendant has also violated 31 U.S.C. §3729(a)(1)(C). Finally, Plaintiff-Relator Cox further alleges that Defendant wrongfully terminated him after he engaged in FCA-protected activity, in violation of 31 U.S.C. §3730(h). (Compl. ¶ ¶ 95-100)

In its Motion to Dismiss and accompanying Memorandum, Defendant presents three arguments for dismissal of Counts I, II, and III. First, Defendant asserts that this Court lacks jurisdiction over the instant case because Plaintiff-Relator Cox's allegations were based upon a public disclosure of which Mr. Cox is not an original source. (Def's Mem. 5-12) Second, Defendant contends that Mr. Cox's First Amended Complaint fails to plead fraud with the requisite specificity under Federal Rule of Civil Procedure 9(b). (Def's Mem. 12-16) Finally,

Defendant maintains that Mr. Cox's Complaint does not allege facts sufficient to show that S&N knew or should have known before terminating Mr. Cox's employment that he was engaged in protected activity under 31 U.S.C. §3730(h).

For the following reasons, however, Defendant's arguments fail, and this Court should deny its motion. First, under the standard clearly articulated by this Circuit and others, S&N's two admissions of wrongdoing in 2008 do not fall under any of the categories constituting "public disclosures" under 31 U.S.C. §3730(e)(4)(A), and therefore do not activate the statute's jurisdictional bar. *See United States v. A.D. Roe Co.*, 186 F.3d. 717 (6th Cir. 1998). Second, the admissions of wrongdoing by S&N company executives alleged in detail by Mr. Cox in his Complaint provide reliable evidence of a fraudulent scheme that distinguishes this case from cases in which courts have required relators to identify actual transactions at the pleading stage. *See U.S. ex. rel. Bledsoe v. Cmty Health Syss*, 501 F.3d 493 (6th Cir. 2007). Third, while Plaintiff-Relator Cox has presented clear evidence of Defendant's intentional and material false statements in more than 100 specific cases, all of which are actionable under 31 U.S.C. §3729 (a)(2) and 31 U.S.C. §3729 (a)(1)(B) (2009), Defendant has failed to offer any argument or facts rebutting this evidence. Fourth, Mr. Cox's allegations of retaliation meet the Sixth Circuit standard exemplified in *United States ex. rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 (6th Cir. 2008). (Compl. ¶ ¶ 63, 65, 68-69, 71) For all of these reasons, this Court should deny Defendant's Motion to Dismiss.

## II.      FACTUAL BACKGROUND

### A. The Trade Agreements Act Applies To Federal Supply Service Contracts Administered by the Veteran's Administration National Acquisition Center.

Defendant Smith & Nephew, Inc. sells medical devices to the United States Government

pursuant to the General Services Administration ("GSA") Multiple Awards Schedule and under the Federal Supply Schedule Program ("FSSP"). (Compl. ¶ 13-15)  This program is managed by the Veterans Affairs National Acquisition Center ("NAC"). *Id.* According to its web site, NAC "solicits, awards and administers VA's Federal Supply Schedule and National Contract Programs including the acquisition and direct delivery of pharmaceuticals, medical/surgical/dental supplies, high technology medical equipment and just-in-time distribution programs (also known as Prime Vendor Distribution Programs)." *See Ex.* 1, About the Office of Acquisition and Logistics, the National Acquisition Center. NAC awards over 1,850 contracts to vendors under this authority "for recurring items used throughout the Federal health care system." *Id.* The General Services Administration (GSA) delegated authority to NAC to oversee the Federal Supply Service Schedule for medical supplies, equipments, and pharmaceuticals.[1] *See Ex.* 2, "Federal Supply Schedule Program," FSS Overview, NAC web site. The Trade Agreements Act applies to all FSS Schedules, including Schedule 65 II A. *See Ex.* 3, FSS101_VA Powerpoint, at 10-13.

### B. The TAA's Prohibitions Against The Sale Or Delivery To The United States Government Of Items From Non-Designated Countries Is Essential To The Statute's Important Public Policy Goals.

Removing trade barriers with other countries is a critical component of U.S. policy with significant ramifications. In a recent speech, Secretary of Commerce Gary Locke stated, "Promoting access for American companies to the Chinese and the entire Asian marketplace is

---

[1] The NAC manages the following FSS Schedules: 65 II A Medical Equipment & Supplies; 65 I B Pharmaceuticals, 65 II C Dental Equipment & Supplies, 65 II F Patient Mobility Devices, 65 V A X-ray Equipment, 65 VII Invitro Diagnostics, Reagents, Test Kits & Test Sets, 66 III Cost-per-Test, Clinical Laboratory Analyzer, 621 I Professional & Allied Healthcare Staffing Services, 621 II Medical Laboratory Testing & Analysis Services. *See* Ex. 3. The Trade Agreements Act applies to all FSS Schedules, including Schedule 65 II A. *See* Ex. 3, FSS101_VA Powerpoint, at 10, 13. Moreover, the Standard Schedule 65 II A contract incorporates FAR 52.225-5. *See* Ex. 13, Standard 65 II A contract.

3

critically important to this Administration. Consider that if we just boosted our exports to Asia – where China is the biggest market – by one percent, that would support another hundred thousand new jobs in the United States." (Ex. 4, Remarks of Secretary of Commerce Gary Locke at the U.S.-China Business Council Annual Forecast Conference (January 28, 2010)).

As a central part of its efforts to promote the expansion of trade opportunities for United States companies, Congress passed the Trade Agreements Act of 1979, 19 U.S.C. §2501, *et. seq.* ("TAA"). Through this legislation, Congress and the President endorsed and accepted certain trade agreements, as well as mechanisms to implement these agreements.[2] The agreements covered by the TAA's requirements and prohibitions are listed at 19 U.S.C §2503(c). Of importance to this case is Subsection (c)(3), which applies the Trade Agreements Act to the Agreement on Government Procurement. 19 U.S.C. §2503(c)(3) (1979).

### C. Given The Value Of S&N's Sales To The U.S. Government, The TAA Provisions, Including The Prohibition On Sales From Non-Designated Countries, Clearly Apply To Defendant's Transactions.

The Agreement on Government Procurement ("GPA") is an instrument of the World Trade Organization. (Ex. 5, WTO: Government Procurement – The Plurality Agreement on Government Procurement) Through this Agreement, 28 signatory countries, including the United States, agreed to permit companies from the signatory countries to participate in each signatory country's government procurement on the same footing as domestic companies. *Id.* Each country, including the United States, prepared a document called Annex 1 that identified agencies to be bound by this arrangement; in the U.S., the covered entities include the General

---

[2] "In accordance with the provisions of section 2112 and 2191 of this title, the Congress approves the trade agreements described in subsection (c) of this section submitted to the Congress on June 19, 1979, and the statements of administrative action proposed to implement such trade agreements submitted to Congress on that date. " 19. U.S.C. § 2503 (a) (1979).

4

Services Administration. *See* Ex. 6, USA Annex 1 to the GPA.  In addition, through the Trade Agreements Act, the United States promised, and the President ordered, that the federal government would not purchase goods and services from countries that did not have an approved trade agreement with the United States.[3] An elaborate set of Federal Acquisition Regulations ("FAR") guidelines implements these policy objectives. *See* Ex. 7, FAR Subpart 25.4, Trade Agreements.

The WTO GPA does not apply to all end products from foreign countries, but only to those whose sales exceed a certain threshold. *See* FAR Subpart 25.402 ("The value of the acquisition is a determining factor in the applicability of trade agreements.") Dollar thresholds, based upon the total dollar value of the procurement, were established to mark the point at which the WTO GPA restrictions would begin to apply. *Id.* To decide whether eligible products from WTO GPA countries are entitled to non-discriminatory treatment, contracting officers must apply FAR Subparts 25.402 and 25.403 to establish the threshold. FAR 25.402(a)(2). This threshold is adjusted every two years. FAR 25.402 (b). In 2007, the TAA threshold for WTO GPA products was $193,000. It was raised to $194,000 on January 15, 2009. 74 F.R. 2745 (January 15, 2009).

Given the volume of S&N sales to the government, it is clear that the TAA provisions have applied, and continue to apply, to S&N's sales to the U.S. Government throughout the period at issue in this case. To calculate the WTO GPA threshold, contracting officers must apply FAR Subpart 25.403(b)(3). If in any given 12 month period, "recurring or multiple awards of the same type of products" are expected, the threshold is computed by calculating the total of

---

[3] The Trade Agreements Act expressly states that the President in most instances cannot accept a trade agreement with another country unless the country "…has accepted the obligations of the agreement with respect to the United States." 19 U.S.C. § 2503 (b) (2) (A) (1979).

the projected annual awards. FAR 25.403(b)(3). Simply put, it is based upon the projected sales for the calendar year. In the case of the NAC, the contract only deals with medical supplies which can be construed as "the same type of product." [4] S&N only sells medical devices, and there has been no annual period when Smith-Nephew sales were less than $193,000; indeed, from calendar year 2000 through 2010, Smith-Nephew sold $9,504,252 worth of products to the Department of Veterans Affairs alone. *See* Ex. 8, USA Spending.Gov Summary of S&N Contracts, attached. Accordingly, as S&N met and surpassed the $193,000 threshold, the Trade Agreements Act provisions apply, and have always applied, to all Smith-Nephew sales to the Government.

### D. The Regulatory Structure Under Which S&N's Government Contracts Are Administered Makes Plain The Prohibition Against Selling And Delivering Products From Non-Designated Countries To The Federal Government.

Countries included as "designated countries" under the TAA are specifically identified by FAR 52.225-5; countries not expressly included do not fall into this category. FAR 52.225-5(a). As Malaysia falls into the latter category, it does not constitute a designated country under the TAA. FAR 52.225-5 not only prohibits the sale of products from non-designated countries to the U.S. Government, but also prohibits contractors from "delivering" products under the contract that are neither made in the U.S. nor from designated countries. FAR 52.225-5(b) ("The Contractor shall deliver under this contract only U.S.-made or designated country end products except to the extent that in its offer, it specified the delivery of other end products in the provision entitled "Trade Agreements Certificate.")

Consistent with the mandate of FAR 25.1101(c)(1), contracting officers must insert FAR

---

[4] Defendant has a contract on FSS Schedule 65 II A for medical supplies and devices. (Ex. 15)

52-225-5, with its express prohibition against delivery of products from non-designated countries, into *all* VA FSS contracts valued at $175,000 or more, including the contract under which S&N sells its medical devices to the U.S. Government. *See* Ex. 9, FSS101; Ex. 10, FAR 25.11, Solicitation Provisions and Contract Clauses. FAR 25.1101(c)(2) also requires the contracting officer to insert FAR 52.225-6, the Trade Agreements Certificate, whenever FAR 52.225-5 is used; each contractor must then execute the certificate.[5] *Id.*

### 1. Under FAR 52.225-5, Contractors Like Defendant S&N Are Required To Expressly Certify Their Compliance With TAA Prohibitions On Sale And Delivery Of Items From Non-Designated Countries.

The Trade Agreements Certificate (FAR 52.225-6) to be executed by contractors has two parts, Subsection (a) and Subsection (b), through which together contractors expressly certify their compliance with the TAA's provisions. Contractors or vendors executing FAR 52.225-6(a), "certif[y] that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" FAR 52.225-6(a). Under subsection (b), the contractor must list with particularity all of those end products that *are not* made in the U.S. and/or were not produced in a designated country. *See* Ex. 9, FAR 52.225-6(b). This information about the country of origin of the end product is of critical importance to the contracting official, who under the TAA does not have the authority to purchase a WTO-GPA end product that is not either made in the U.S. or from a designated country, except under extremely limited circumstances. This information is also critical to the vendors responsible for executing the Certificate, since under the TAA and its implementing regulations, vendors are only permitted to deliver end products from the U.S. or

---

[5] The Standard Contract used for contractors on Schedule 65 II A, including S&N, indicates that the Trade Agreement Certificate is attached to the contract as Exhibit 3. See Ex. 13, Worldwide Federal Supply Schedule Contract for FSC Group 65, Part II, Section A: Commodity: Medical Equipment and Supplies at 136.

designated countries.[7]

### 2. Under FAR 25.502(B), Contracting Officers May Only Purchase End Products Made In Non-Designated Countries If They Received *No* Offers Of End Products Made In The U.S. Or In Designated Countries.

FAR Subpart 25.502(b) specifically addresses the procedures contracting officers must follow when dealing with acquisitions covered by the WTO GPA. FAR 25.502 (b). Under FAR 25.502(b), contracting officers are directed to "consider *only* offers of U.S.-made or designated country end products, unless *no* offers of such end products were received." FAR 25.502 (b)(1) (emphasis added). The contracting officer must assign preference to offers of items from designated countries, and, if possible, much purchase one of these preferred end products in lieu of products made in non-designated countries. FAR 25.103(b). Once the contracting authority identifies the eligible offers, the contracting officer must give equal consideration to end-products from the U.S. and designated countries and make the award based upon the lowest price. FAR 25.502(b)(2). Only when there are *no* offers of U.S-made or designated country made end products, can the contracting officer then consider products from non-designated countries. FAR 25.502(b)(3).

Read together, FAR 52.225-5(b) and FAR 25.502(b) severely reduce the likelihood of any foreign product from a non-designated country *legitimately* reaching a federal facility. Besides the fact that a contracting officer can only buy an end product from a non-designated country if there are no available products from the U.S. or a designated country, FAR 25.502 (b)(2), a vendor that fails to list a foreign item as originating in a non-designated country

---

[7] Note that FAR 52.225-5(b) and 52.225-6(b) both use the word "shall" respecting the duty of the vendor to (1) deliver only end products made in the U.S. or designated countries, and (2) expressly list any and all end products originating from non-designated countries.

pursuant to FAR 52.225-5(b) when executing FAR 52.225-6(b) has an independent obligation not to "deliver" the products to the Government. *See* Section II(D)(1), *supra*. Thus, a company that fails to list a product's truthful country of origin pursuant to FAR 52.225-5(b) and FAR 25.502(b) is not only guilty of a false statement by omission, but is guilty of a further violation if it then *delivers* any such erroneously unlisted products to the U.S. government, and/or presents a claim for payment based upon that delivery.

### E. Mr. Cox's Complaint Shows That S&N Was Well Aware That It Was Selling Unidentified TAA-Non-Compliant Products To The United States Government.

As elaborated in Plaintiff-Relator's Complaint, Mr. Cox worked for Defendant S&N as the Information Technology Global Director of Enterprise Resource Planning from December 2007 through September 2008. (Compl. ¶ ¶ 12-13) In mid-January 2008, Mr. Cox attended a meeting with Bill Griffin, Senior Vice President of Global Operations for Orthopaedics, Jon Schauber, Global Vice President of Information Technology, and Tom Leonard, Director of S&N's Global Distribution Center ("GDC"). (Compl. ¶ 57) During that meeting, the attendees discussed, among other issues, specific elements that were designated as being beyond the scope of the GDC project, which included elements essential to the determination of country of origin for S&N products. (Compl. ¶ 59) During the same meeting, Griffin and Schauber affirmed their personal knowledge that S&N was violating TAA guidelines concerning country of origin, but also determined that no changes to the scope of the GDC project would be made to address these violations. (Compl. ¶ 60)

In late January 2008, Plaintiff-Relator Cox met with Tom Macelravey, Vice President of Sales/Supply Chain for Reconstructive Surgery, who affirmed specifically that S&N was sending TAA-non-compliant products to the U.S. Military through its contract with the Department of

Defense, and stated that this was "go to jail activity." (Compl. ¶ 62) During that same week in late January 2008, Mr. Cox met with David Ruff, the Director of Trauma Sales/Supply Chain for Smith & Nephew, who affirmed that he, too, knew of S&N's practice of shipping TAA-non-compliant Malaysian end products to the United States military, and affirmed further that this error had not been reported. (Compl. ¶ 63)

In early February 2008, Plaintiff-Relator Cox met with VP Schauber, in hopes of convincing S&N to amend its GDC project to remedy the Company's non-compliance with TAA country of origin provisions. (Compl. ¶ 65) Schauber rejected Mr. Cox's suggestion, and implied that Mr. Cox's discussion of these matters would have consequences. *Id.* Additionally, in early February 2008, Cox discussed S&N's violations of the TAA with Steve Kahn, Vice President of Quality for Smith & Nephew, who expressed his concern about S&N's false certifications of compliance associated with its sales of Malaysian end products to the U.S. Military. (Compl. ¶ 66) VP Kahn stated that he was so concerned about Defendant's illegal conduct that he had raised the issue with the Presidents of the Orthopedics Division, Mark Augusti and Joe Devivio, and had held internal meetings with several S&N departments in hopes of raising internal awareness of the violations, all to no avail. *Id.*

In early February 2008, Jon Schauber and Sal Chiovari directed Cox to undertake a "Country of Origin Batch Determination" project. (Compl. ¶ 67) At a meeting in early March, high-level S&N executives proposed various strategies to mask these violations, including by marking boxes of S&N products "Proudly Packaged in the USA," or by sending products to Defendant's facilities in Germany for packaging, giving the illusion that end products purchased from non-designated countries had in fact been made, or at least "significantly transformed," in Germany. (Compl. ¶ 68) Yet again, during this meeting, it was acknowledged that products

10

manufactured in Malaysia were being shipped to the United States military, along with other customers, in violation of the Federal Trade Agreement. *Id*.

**F. Though Aware Of Its TAA Non-Compliance, S&N Has Falsely Certified TAA Compliance Under Its Contract With The U.S. Government Since At Least 2003.**

S&N's contract Number V797P-4403a, to provide Medical Supplies and Services to the United States Government, falls under Schedule 65 II A (Compl. ¶ 28), one of the schedules under which contractors are required to expressly certify their TAA compliance by executing FAR Subsection 52.225-6.[8] The standard[9] Schedule 65 II A contract specifically states that, "Products offered under this solicitation that are not end products of the United States or 'Designated Countries' will not be considered for award." (Ex. 13, Current 65 II A Contract at 9) The contract then lists designated countries (*id*), and further incorporates FAR 52.225-5. (*Id*. at 36-39), expressly stating that "Clause 52.225-5, Trade Agreements, and its companion certification[10] provision which are included elsewhere in this solicitation, are applicable to all items in this solicitation **EXCEPT** the following: SIN(s) A-13a and A-13c [sterile latex gloves and sterile vinyl]." *Id*. at page 39.

---

[8] As noted in the Complaint, S&N's certifications are affirmed on the GSA Advantage web site, where its products are listed as "Made In: UNITED STATES OF AMERICA." *See* Compl., Ex. 1-A.

[9] The standard contract for contractors doing business under Schedule 65 II A is available at the GSA Advantage Website. *See* Ex. 11, Schedule Summary for 65 II A. The contract prefix for each of the vendors remains the same "V797P" but the number after the hyphen changes. *See* Ex. 12, Federal Supply Schedule, Medical Equipment and Supplies, 65 II A (November 2002). Certain contract terms, however, are applicable to all vendors selling on this schedule. *See* Ex. 13, Current 65 IIA contract.

[10] Ex. 13 – Representations and Certifications, attached to the standard contract, contains the following certification regarding the Trade Agreements Act: "(i) The offeror certifies that each end product, except those listed in paragraph (g)(4)(ii) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled 'Trade Agreements.' (ii) The offeror shall list as other end products those end products that are not U.S.-made or designated country end products."  FAR 52.225-6 also states that "[t]he Government will evaluate offers in accordance with the policies and procedures of FAR Part 25. For line items covered by the WTO GPA, the Government will evaluate offers of U.S.-made or designated country end products without regard to the restrictions of the Buy American Act. The Government will consider for award only offers of U.S.-made or designated country end products unless the Contracting Officer determines that there are no offers for such products or that the offers for such products are insufficient to fulfill the requirements of the solicitation."

11

Given the requirements of the Schedule 65 II A contract, it can reasonably be inferred that S&N must have provided a statement respecting the country of origin of its products for this information to appear on the VA-FSS Schedule, since FAR 52-225.6 expressly required the Company to list any products from non-designated countries. *See* Ex. 13. Moreover, the GSA Advantage Vendor Help page makes it clear that contracting companies, not the Government, are responsible for the information appearing on the website. *See* Ex. 14, GSA Vendor Help ("The completeness and accuracy of the data submitted is your responsibility, so please ensure that your products and services are adequately described.")

In short, under the regulatory structure and express contract requirements described above, it is clear that S&N is responsible for falsely certifying that at least 107 Malaysian end products listed for sale on the VA-FSS web site were made in the U.S., and for failing to list these products with their true (non-designated) country of origin under Subsection (g)(4)(ii). *See* Compl. ¶ 34-37. The 107 products, each listed with incorrect country of origin, in all likelihood led to at least 321 distinct false statements, based upon the applicable contract and regulatory structure. (Compl. ¶ ¶ 30-55) Similarly, the above-described regulatory structure suggests that contracting officers must have relied upon S&N's certifications when purchasing the Company's unidentified TAA-non-compliant products.

## III.   ARGUMENT

### A. Defendant's Voluntary Admissions Of TAA-Non-Compliance To Certain Government Entities In 2008 Are Not "Public Disclosures" Under 31 U.S.C. §3730 (E)(4)(A) And Thus Present No Bar To This Court's Jurisdiction.

Defendant's first argument for dismissal is based on the contention that its voluntary admission of wrongful behavior in letters sent to the Department of Defense Inspector General and the VA National Acquisition Center in September 2008 constitute "public disclosures" under

12

31 U.S.C. §3730 (E)(4)(A), and thus present a bar to this Court's jurisdiction in the instant case (Def's Mem. 6-10). To support this contention, Defendant relies primarily upon precedent from the Seventh Circuit, *United States ex. rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730 (7th Cir. 2007). While the Seventh Circuit's holding clearly would not constitute controlling authority in this case, Defendant nevertheless urges reliance on *Fowler* on the grounds that "there apparently are no decisions in this Circuit as of yet that directly hold that an FCA defendant's affirmative disclosure of potential FCA issues to government investigative and/or contractual officials constitutes a public disclosure." (Def's Mem. 8.)

Contrary to Defendant's assertion, however, its argument flies in the face of settled authority in both this Circuit and others holding that an admission like that offered up by S&N does not fit within the FCA's narrow definition of a "public disclosure," and thus raises no jurisdictional bar. Instead, this Circuit, along with others including the First, Third and Eleventh, has held that a jurisdictional bar on the basis of "public disclosure" is only raised in the narrow circumstances expressly enumerated at 31 U.S.C. §3730 (e)(4)(A), namely where allegations or transactions in question have been publicly disclosed:

(1) in a criminal, civil, or administrative hearing;

(2) in a congressional, administrative, or [General] Accounting Office report, hearing, audit or investigation; or

(3) in the news media.

31 U.S.C. §3730(e)(4)(A).[12] *See also A.D. Roe*, 186 F.3d. at 725. Nothing in the language of the

---

[12] "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730 (e)(4)(A).

statute would lead to the conclusion that a defendant could create a "public disclosure" solely by voluntarily writing a public official. Because Defendant's letters admitting TAA-non-compliance do not fall within any of the FCA's specifically enumerated categories constituting "public disclosure," they do not trigger the statute's jurisdictional bar. Consequently, this court has jurisdiction.

Contrary to Defendant's assertion, the Sixth Circuit has clearly articulated its position on the Public Disclosure Bar. In *A.D. Roe*, 186 F.3d. at 723, the court considered whether a trial court had properly dismissed a case under the "public disclosure" provision of the FCA, and concluded that the trial court had not weighed all of the necessary factors in reaching its conclusion, *id*. at 724. In particular, the Court noted:

> The district court in the case at hand focused solely upon the "public disclosure" element of the jurisdictional test and failed to recognize that the public disclosure must be of "allegations or transactions" *in particular settings*, such as hearings, reports, investigations, or news. The qui tam action will not be barred because of public disclosure unless all of the elements of the jurisdictional bar are present.

*Id*. (emphasis added) Thus, contrary to Defendant's misleading suggestion, the Sixth Circuit has expressly recognized that a public disclosure must occur "in particular settings" to raise the jurisdictional bar. *Id*. Moreover, the court in *Roe* plainly stated that the narrow list of settings enumerated in the FCA statute is "exhaustive," noting that "[i]f the information obtained by the relator does not constitute allegations or transactions *from one of these sources*, then the statute *did not mean to exclude claims on that basis*." *Id*. at 725. Consistent with the plain language of the FCA, the Sixth Circuit has thus taken the position that confessions of wrongdoing falling clearly outside all three categories identified by the statute do not constitute "public disclosures" as the statute defines that term, and thus raise no jurisdictional bar to suit.

Applying the Sixth Circuit's clearly articulated holding to the instant case, Defendant's

14

September 2008 letters admitting wrongdoing fall well outside the three categories expressly outlined by the statute, and thus do not constitute "public disclosures" of the sort that would raise a jurisdictional bar to Mr. Cox's suit. While both letters submitted by Defendant as exhibits to its Motion to Dismiss (Decl. of Glen Reid, Ex. A and B) demonstrate that Defendant voluntarily notified the Government of its wrongdoing, there is no evidence that it did so in the context of any ongoing government investigation or audit, nor was the information released in the context of a Congressional Hearing or in the news media. In short, these letters are not "public disclosures" that would bar suit under the FCA, since they did not originate "in particular settings, such as hearings, reports, investigations, or news." *A.D. Roe*, 186 F.3d at 725. Consistent with the Sixth Circuit's holding in *A.D. Roe*, since "the information obtained by the relator does not constitute allegations or transactions from one of these sources, [ ] the statute did not mean to exclude claims on that basis." *Id*. at 725.[13]

Contrary to Defendant's arguments for dismissal, the Sixth Circuit has consistently held that the determination of whether Section 3730(e)(4) applies to a relator's case is strictly limited to three questions: "(A) whether there has been a public disclosure in a criminal, civil or administrative hearing; or congressional, administrative, or government report, hearing, audit, or investigation; or from the news media; (B) of the allegations or transactions that form the basis of the relator's complaint; and (C) whether the relator's action is 'based upon' the publicly disclosed allegations or transactions." *Jones v. Horizon Healthcare Corp*., 160 F.3d 326, 330 (6th Cir. 1998). If the answer to any of these questions is "no," then "the inquiry ends and the qui tam action may proceed." *Id.* Where, as in the instant case, Defendant's admissions did not take

_____

[13] While Defendant cites *A.D. Roe* in a footnote to its Motion to Dismiss (Def's Mem. 6, n. 3), Defendant fails to note that the case actually stands for a proposition that is diametrically at odds with the Defendant's argument that its letters constitute "public disclosures" under the FCA.

place in the proper setting, the answer to the first of these three questions is "no," and this case should be permitted to proceed.[14]

Consistent with the Sixth Circuit's position, numerous other Circuits have interpreted the FCA's public disclosure bar narrowly, consistent with the plain language of the statute itself. *See e.g., United States ex. rel. Williams v. NEC Corp.*, 931 F.2d. 1493, 1499 (11th Cir. 1991) ("As a preliminary matter, we find that the methods of 'public disclosure' set forth in section 3730(e)(4)(A) are exclusive of the types of public disclosure that would defeat jurisdiction under that section."); *United States ex. rel. Leblanc v. Raytheon Co.*, 913 F.2d 17, 20 (1st Cir. 1990) ("[Section 3730(e)(4)(A)] bars jurisdiction over actions 'based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media…' It does not deny jurisdiction over actions based on disclosures other than those specified"); *United States ex. rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 744 (3rd Cir. 1997) ("The prevailing view is that this list [of sources for public disclosures] constitutes an exhaustive rendition of the possible sources. We agree.").

Far from constituting public disclosures that would warrant dismissal of this action under the FCA's public disclosure bar, Defendant's letters actually constitute admissions of wrongdoing consistent with Plaintiff-Relator Cox's allegations. (Compl. ¶ 57-69)   While the FCA encourages self-reporting, it does not reward this conduct by exculpating wrongdoers who volunteer such admissions from all liability for their fraudulent conduct. *See* 31 U.S.C. §3729(a)(2) (1986). Instead, the FCA allows courts to consider all cooperative behavior of a *qui*

---

[14] Defendant also cites the *Jones* case (Def's Mem. 6), but again fails to indicate that the case's holding undercuts its argument.

*tam* defendant, including self-reporting, at the *penalties* stage of a *qui tam* action. *Id.* Further, where a Defendant submits "all information known to [it] about the violation within 30 days after the date on which the defendant first obtained the information," the statute permits courts to assess double damages instead of treble damages. *Id.* Given that Plaintiff-Relator Cox has alleged that significant, high-level discussions of S&N's country of origin violations occurred repeatedly in January, February and March of 2008, however, Defendant's choice to self-report its violations in September 2008 does not entitle S&N to even this statutorily permissible reduction, since that self-reporting clearly did not occur "within 30 days after the date on which the defendant first obtained the information." *Id.*

### B.   Plaintiff's Complaint States A Viable Cause Of Action Under The FCA.

Without making any distinctions between the various causes of action available under the False Claims Act, Defendant makes the argument that the complaint lacks sufficient specificity to survive a Rule 9(b) challenge. (Def's Mem. 12-15) Not once does Defendant set forth and discuss the complex elements of proof necessary to make out a cause of action under the FCA. *See id.* Moreover, Defendant demonstrates no appreciation for the existence of *multiple* causes of action that would trigger liability under the statute, and fails to acknowledge the clear relationship between the regulatory structure in place to enforce the TAA at the NAC and the many false statements it has made. In short, Defendant has not made an adequate case for dismissal at this stage of the proceedings.

A complaint will survive a motion to dismiss, if, after taking all of the facts and inferences in the light most favorable to the non-moving party, the complaint states a viable cause of action. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). In ruling upon a motion to dismiss, a court is generally confined to facts and inferences derived from the

complaint, but a court may consider public records, and may also take judicial notice of facts which are not subject to reasonable dispute. *See id.* at 562. Applying this standard, this Court should deny Defendant's Motion to Dismiss.

### 1. Plaintiff-Relator Cox's Complaint States A Viable Cause Of Action Under 31 U.S.C. §3729 (A)(1)(A) And Former 31 U.S.C. §3729(A)(1).[15]

Defendant contends that Cox's allegation fails to meet the Rule 9(b) particularity requirements because "[r]elator's complaint…fails to allege that S&N submitted a single, specific false claim for payment to the government." (Def's Mem. 13). Defendant fails, however, to address the Rule 11(b)(3) exception "allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood,* 528 U.S. 549, 560 (2000). This exception allows claims to move past the pleading stage when they are "based on evidence reasonably anticipated after further investigation or discovery." *Id.* This relaxed approach to Rule 9(b) particularity requirements is most relevant to the former section 31 U.S.C. §3729 (a)(1), as the pleading requirements of 31 U.S.C. §3729(a)(2) require even less.[16]

The Sixth Circuit, for its part, recognized the Rule 11(b)(3) exception long before the Supreme Court addressed the issue in *Rotella.* In *Michaels Building Co. v. Ameritrust Co.*, 848 F.2d. 674, 680 (6th Cir. 1988), the Sixth Circuit explained that

> [i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.

---

[15] Both of these provisions make it illegal to knowingly present a false claim for payment or approval.

[16] "While we will assume that Rule 9(b) will exact some cost, we are wary of allowing speculation about that cost to control the resolution of the issue here. Rotella has presented no case in which Rule 9(b) has effectively barred a claim like his, and he ignores the flexibility provided by Rule 11(b)(3), allowing pleadings based on evidence reasonably anticipated after further investigation or discovery. *See e.g.*, *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1050-51 (7th Cir. 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim)." *Rotella*, 528 U.S. at 560.

Under such relaxed Rule 9(b) requirements, relators must satisfy the following in order to plead with particularity:

> [A] relator's complaint, if it cannot allege the details of an actually submitted false claims, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that led to a strong inference that claims were actually submitted.

*United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). *See also United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) ("[A] relator could satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim.") (internal citations omitted)

Though the instant suit is based upon the FCA, while *Rotella* concerned RICO, Plaintiff-Relator Cox's complaint similarly establishes a pattern of fraud and misrepresentation that illustrates the high likelihood that targeted discovery will uncover the evidence necessary to rule favor of Cox. As discussed in Part II, *supra*, it is reasonable to infer in the instant case that over 321 false statements accompanied S&N's misrepresentations of the country of origin for at least 107 Malaysian end products for sale to the U.S. Government. Where VA-FSS regulations do not permit vendors to list and sell Malaysian-made products, it can be reasonably inferred that S&N recognized that it would be difficult to sell properly identified Malaysian products, and opted instead to misrepresent the country of origin of its Malaysian end products for the purpose of selling those products to the U.S. Government. Indeed, the series of meetings that Cox attended where S&N management discussed the Company's TAA-non-compliant sale of Malaysian products to the U.S. Military, joked about it, and declined to correct it, shows a callous disregard for the contract and the regulations, and an intentional attempt to sell forbidden products to the

19

Government. (Compl. ¶¶ 62-67)

The specific documents "reasonably anticipated after further investigation or discovery" are the Defendant's actual requests for payment from the government and the corresponding payment stubs. *Rotella*, 528 U.S. at 560. Given the large number of misrepresented products already identified by Mr. Cox, as well as the broadly inculpatory statements made by high level S&N executives, the recovery of payment requests and their corresponding payment stubs in the instant case, can be "reasonably anticipated" after targeted discovery. *Rotella*, 528 U.S. at 560.

  **a. The Sixth Circuit Addressed A Factually Distinguishable Situation In *United States Ex. Rel. Bledsoe v. Community Health System*, 501 F.3d. 493 (6th Cir. 2007)**

Defendant also attempts (Def's Mem. 12) to rely upon the Sixth Circuit's decision in *United States ex. rel. Bledsoe v. Community Health System*, 501 F.3d. 493 (6th Cir. 2007) (hereinafter "*Bledsoe II*"). In *Bledsoe II*, the court, under the facts presented, refused to recognize any of the relator's 31 U.S.C. §3729(a)(1) claims, save for the one claim where the relator produced a specific instance of fraudulent billing. *Id*. at 514. Plaintiff-Relator Cox's allegations, however, differ in all meaningful particulars from the claims addressed by the court in *Bledsoe*, regarding which the Sixth Circuit stated that it did "not consider the allegations to be part of a single, overarching fraudulent scheme." *Id*.

At the outset, it should be noted that, to the extent that the claims in this case arise out of conduct that occurred after May, 20, 2009 – the effective date of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Rule 9(b) analysis in Bledsoe is inapplicable.  In its report on FERA, the House Committee on the Judiciary stated that

   [M[any courts have overly strictly applied Rule 9(b) of the Federal Rules of Civil Procedure to False Claims Act suits. Rule 9(b) requires claims to be pled with particularity, to ensure that defendants are given proper notice of any claims that are

being level against them so they can formulate a vigorous defense. In False Claims Act suits, however, many courts have required a degree of specificity that is not only beyond what is necessary to give defendants notice of the charges against them but goes far beyond the information readily available at the pleading stage to many qui tam relators with meritorious allegations.

A relator may have knowledge of the method of fraud employed, for example, but not be in possession of detailed records documenting precisely how the fraud was executed. Courts have nevertheless ruled against relators who could not provide the false invoices or phoney billing records, even though they are not generally available to anyone outside a company's billing department—often without even providing an opportunity for discovery.

H. Comm. on the Judiciary, False Claims Act Correction Act of 2009, H.R. Rep. No. 11-97, at 7-8 (2009) (emphasis added) (footnotes omitted). The report went on to list Bledsoe as one of the wrongly decided cases.  *Id*. at 8 n.38.

Even with respect to claims arising out of conduct that occurred before May 20, 2009, however, Defendant's reliance on *Bledsoe* is misplaced. In *Bledsoe*, the relator was a respiratory therapist who was employed by the defendant hospital from April 1995 through July 1999, during which time he became aware of what he perceived to be billing irregularities. *Bledsoe*, 501 F.3d at 497. The relator reported the perceived problem to the Office of Inspector General of the U.S. Department of Health and Human Services, and cooperated in an investigation that followed. *Id*. However, the Sixth Circuit remained skeptical of Bledsoe's allegations where he had failed to identify the particulars of the fraudulent scheme *or* the fraudulent claims at issue. *United States ex. rel. Bledsoe v. Community Health System*, 342 F.3d 634, 643 (6th Cir. 2003) (hereinafter "*Bledsoe I*"). It was for this reason that the Sixth Circuit in *Bledsoe I* "concluded that Relator's FAC was insufficient under Rule 9(b) because it failed to set forth the dates of various FCA violations, the particulars of the incidents of improper billing, or, with one exception, the names of the individuals involved in the improper billing." *Id.* at 504 (citation omitted). Even in

21

rejecting Bledsoe's claims, however, the Sixth Circuit in *Bledsoe II* acknowledged that "[w]here the allegations in a relator's complaint are 'complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.'" *Id*. at 509 (citations omitted).

Unlike *Bledsoe*, where the relator was a front line employee, Plaintiff-Relator Cox was employed by Defendant S&N in an executive position, as the Information Technology Global Director of Enterprise Resource Planning. (Compl. ¶ 13)  In this capacity, Mr. Cox not only attended meetings at which high level executives admitted the very violations Plaintiff-Relator now alleges. (Compl. ¶¶ 56, 57, 60, 62, 63, 65) In February 2008, Mr. Cox was asked to work on a project directly related to the tracking of product countries of origin. (Compl. ¶ 67) Finally, on several occasions Mr. Cox attempted to convince S&N executives to take steps to remedy the Company's TAA-non-compliant policies and practices, as a result of which he was harshly rebuffed and threatened with termination. (Compl. ¶ 65)

According to *Bledsoe II*, a complaint satisfies Rule 9(b) "if it alleges "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  501 F.3d at 509 (internal quotations and citations omitted). In the instant case, Plaintiff-Relator Cox's multiple conversations with S&N management personnel in early 2008 concerning the violations he alleges provide the "time, place, and content of the alleged misrepresentation." As of early 2008, S&N was engaged in a course of ongoing conduct in which the Company knowingly misrepresented the country of origin of Malaysian products in violation of federal contracts and applicable regulations, and then "shipped" these misidentified products to the United States

Government in violation of the TAA.[18] Thus, the complex, multi-year fraudulent scheme at issue in this case is clearly laid out in Mr. Cox's Complaint. Moreover, the structure of the TAA regulatory scheme at issue also allows for the reasonable inference that harm resulted from S&N's false statements, since the United States Government will not purchase end products that did not originate in the United States or a designated country. Taken together, Mr. Cox's allegations thus satisfy the *Bledsoe* standard.

In the case at bar, the statements of Smith & Nephew executives about their practices in this regard are just as reliable indicia of the fraudulent scheme at issue as would be evidence of a specific claim presented. Indeed, these statements by management employees, made in the scope of their employment about matters within their purview, would be admissible as evidence of S&N's fraudulent scheme pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence. *See Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (Rule 801(d)(2)(D) of the Federal Rules of Evidence...provides, in relevant part, that a "statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.") Moreover, given that the S&N managers who made the statements in question have been adequately identified, S&N should be able to "prepare an informed pleading responsive to the specific allegations of fraud." *Bledsoe*, at page 504.

While these party admissions by multiple S&N managers taken on their own would suffice to support a plausible inference of fraud, Mr. Cox has provided additional evidence to support his allegations of S&N's fraud. In January, 2010, a review of products available on the

---

[18] While the words "shipping" and "purchasing" are used in the complaint, it is reasonable to infer that these activities took place after S&N had sold products to the Government. *See* Compl. ¶¶ 58, 60, 62-63.

VA-FSS and GSA websites uncovered over 100 products that S&N listed as being made in the United States, when in fact documents provided by Mr. Cox as exhibits to his Amended Complaint show that these products were made in Malaysia. (Compl. ¶ 34-35) In support of his allegations to this effect, Plaintiff-Relator Cox attached as exhibits to his Amended Complaint the more than 100 actual screen shots of product listings on the VA-FSS (Compl. Ex. 1-B) and GSA (Compl. Ex. 1-A) websites. These screen shots include specific and detailed information about each of the S&N products in question, including the serial numbers and product description.

These listings, which themselves constitute violations of the TAA as explained in Part II, *supra*, appeared two years after Defendant's executives acknowledged similar violations in conversations with Mr. Cox, as elaborated in Plaintiff-Relator's Complaint. From this, it may be inferred that S&N at some point in time prior to January 2008 began to knowingly and intentionally sell and deliver improperly identified Malaysian end products to the United States Government, in violation of the TAA. "Selling" and "delivering" products are activities from which it is, in turn, reasonable to infer that S&N presented claims for payment to the Government for the same products it had sold and delivered to the Government. Moreover, with the level of detail provided by Plaintiff-Relator Cox concerning S&N's record keeping (Compl. ¶ 43), narrowly targeted discovery will swiftly reveal exactly how many Malaysian end products were, in fact, sold by S&N to the U.S. Government, which in turn will establish the extent of S&N's liability under the FCA.

### b.  Many Circuits endorse a Relaxed Rule 9(b) standard

Further weighing against Defendant's request for dismissal is the growing sentiment among the Circuit Courts that a more relaxed approach needs to be taken respecting *qui tam*

lawsuits due to their inherently inferential nature. When a Rule 9(b) motion to dismiss is based on a lack of "specific request[s] for payment," a claim may move forward beyond the pleading stage if it can show "in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854-855 (7th Cir. 2009). *See id.*, at 854 ("We don't think it is essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit."). The reason the Seventh Circuit elected not to require invoices and accompanying representations at the outset of a *qui tam* suit is that much of a *qui tam* claim is based on inferential knowledge. *Id.* ("True it is essential to show a false statement. But much knowledge is inferential—people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime—and the inference that Lusby proposes is a plausible one.")

The *Lusby* complaint alleged that Rolls Royce sold products to the government that did not comply with Federal Acquisition Regulation 246-15, while inferring that Rolls Royce had submitted the necessary FAR 246-15 certificate of compliance. *Id.* The Seventh Circuit contended that if there were, hypothetically, 50 invoices, "[t]he probability that the military would accept 50 shipments in a row without a certificate is 0.5 to the 50th power," and that though this still leaves the remote possibility that all invoices could have been shipped without a fraudulent certificate, "even a requirement of proof beyond a reasonable doubt need not exclude all possibility of innocence; nor need a pleading exclude all possibility of honesty in order to give the particulars of fraud." *Id.*

As in *Lusby,* the only documents missing from the instant complaint are the Defendant's actual requests for payment from the government and the corresponding payment stubs. Everything else is sufficiently accounted for. Plaintiff-Relator Cox's Complaint alleges and

incorporates the supporting paragraphs and documents detailing the fraud alleged. (Compl. ¶ 79-94). The complaint then alleges that S&N (the "who") submitted false claims for payment and reimbursement to the government by knowingly or recklessly making false statements about the country of origin of products for sale to the United States Government (the "what") throughout the term of its VA-FSS contract, from 2002 through the present (the "when"). (Compl. ¶ 15) As stated in *Lusby*, a pleading is not required to "exclude all possibility of honesty in order to give the particulars of fraud." *Id.* An Ex.ion of expansive, and routine dishonesty by a particular entity over the course of a particular year is an example of the "[a]lternative means" which are available to relators to satisfy Rule 9(b) particularity requirements. United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1310 n. 18 (11th Cir. 2002) (citing *Durham v. Business Management Associates*, 847 F.2d 1505, 1512 (11th Cir. 1988)).

The Fifth Circuit provides further support for taking a relaxed approach to Rule 9(b). In *U.S. ex rel. Grubbs v. Kanneganti, et al*., the Fifth Circuit held that,

> to plead with particularity, the circumstances constituting fraud of a False Claims Act §3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claims, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that led to a strong inference that claims were actually submitted.

565 F.3d 180, 185 (5th Cir. 2009). The First Circuit repeated this rationale in *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, stating that "a relator could satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim." *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) (citing *U.S. ex rel. Rost v. Pfizer, Inc*., 507 F.3d 720, 733 (1st Cir. 2007)). This string of decisions all but eliminates the need to provide factual evidence as to each submitted false claim, which is all that Defendant alleges is currently

missing from the instant claim.

    **2.   Plaintiff-Relator's Complaint States A Viable Cause Of Action Under 31 U.S.C. §3729(A)(2) For Claims Before June 7, 2008, And Under 31 U.S.C. §3729(A)(1)(B) For Claims Pending On Or After June 7, 2008.**

Under the Fraud Enforcement and Recovery Act, which modified the False Claims Act, the former 31 U.S.C. §3729(a)(2) has been amended to impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729 (a)(1)(B). Though the law was enacted on May 20, 2009, it applies to all claims pending as of June 8, 2008. All claims predating the June 8, 2008 deadline are subject to the old guidelines of 31 U.S.C. §3729(a)(2), under which, "a plaintiff must prove that the defendant made false statements to get a false claim paid or approved, not that the defendant caused the submission of the claim itself." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1330 (11th Cir. 2009).[19] This is consistent with the Sixth Circuit's decision in *United States ex. rel. Sanders v. Allison Engine*, 471 F.3d 610, 618 (6th Cir. 2006).

Section (a)(1)(B), which is included in the section entitled "Liability for Certain Acts," creates liability for knowingly making false statements that are material to a false or fraudulent claim. 31 U.S.C. §3729(a)(1)(B). The term "claim" is defined as "any request or demand…for money or property that is presented to an officer, employee, or agent of the United States." 31 U.S.C. §3729(b)(2). The term "material" is then defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4). The conduct prohibited is the making of a material false statement. 31 U.S.C. §3729(a)(1)(B). By its very terms, §3729(a)(1)(B) is based not upon transactions but upon

---

[19] Regardless of which standard applies to the current complaint, "the identity of the person or entity who submitted or caused to be submitted a claim is not an element of a § 3729(a)(2) cause of action." *Hopper*, 588 F.3d at 1329. The applicability or non-applicability of FERA does not affect this.

*statements* that have a "natural tendency to influence" or are "capable of influencing" the payment or receipt of money by the United States Government. Accordingly, the most natural reading of the statute leads to the conclusion that liability is primarily triggered by material misstatements. Therefore, for a Complaint brought under §3729 (a)(1)(B) to satisfy Rule 9(b), it must, like the instant Complaint, simply identify the material false statements in question. Nothing in the language of the FCA suggests that the absence of claims or transactions at the complaint stage warrants dismissal of a complaint alleging violations of §3729(a)(1)(B).

Essentially, FERA relaxes the False Claims Act to the point at which (1) intent is no longer necessary, so long as the false statements themselves are "material" to the fraudulent claims; and (2) payment is no longer a necessary element under §3729(a)(2).[20] Because Mr. Cox's Complaint alleges a long series of continuing misstatements that provide the backbone for the alleged fraudulent claims, these false statements must be considered material to the claims themselves. Moreover, because there is no requirement that Cox present the paid invoices themselves, Cox is not required under the amended standards to present any further transactional evidence at this stage. *See Lusby*, *supra*; *Pogue*, *supra*.

FCA §3729(a)(1)(B) makes no reference to "transactions," speaking instead of "material false statements." If a false statement is "capable of influencing the payment of money," it

---

[20] This statement is consistent with Senate Report 111-10 of the FERA, which states: "To correct the *Allison Engine* decision, S. 386 contains three specific changes to existing section 3729 (a)(2) and (a)(3). In section 3729 (a)(2) the words 'to get' were removed striking the language the Supreme Court found created an intent requirement for false claims liability under that section. In place of this language, the Committee inserted the words 'material to' a false or fraudulent claim. Further, the language 'paid or approved by the Government' was removed to address both the decision in *Allison Engine*, and to prevent a new 'presentment' requirement from being read into the section. Finally the new term 'material' is defined later in the section to mean 'having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property.' This definition is consistent with the Supreme Court definition, as well as other courts interpreting the term as applied to the FCA." 111th Congress, 1st Session. Senate Report 111-10. Fraud Enforcement and Recovery Act of 2009 (March 23, 2009) at 12 (internal citations omitted).

violates this subsection of the FCA. Thus, the absence of transactional information does not defeat a claim at this stage. Indeed, based upon the plain language of the FCA statute, in order to ultimately prevail, a relator only needs to prove only that a material false statement was made or created in order for a defendant to be held liable for at least statutory damages. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004); *see also*, *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (indicating that the interpretation of a statute begins with its text, and there is no need to proceed to legislative history unless the text is ambiguous).

Whether one applies the standard set forth by §3729(a)(2) or the newly enacted §3729(a)(1)(B), Plaintiff-Relator Cox's Complaint states a viable cause of action by alleging that S&N made multiple false statements and certifications about the country of origin of products that it sold to the United States Government. (Compl. ¶ 81.) The complaint alleges that Defendant made these false statements for the purpose of selling products to the U.S. Government that would otherwise not have been eligible for sale. *Id.* Accordingly, the allegations in the complaint draw a nexus between the statements made, the Company's intent to deceive, reliance by the contracting officers, and actual sales to the Government.

### 3.  S&N Knew Or Should Have Known That Plaintiff-Relator Cox Was Engaged In FCA-Protected Activity At The Time He Was Terminated.

Defendant urges this court to dismiss Mr. Cox's claim under 31 U.S.C. §3730(h), asserting that Mr. Cox's failed to allege that he was engaged in protected activity of which S&N was aware. (Def's Mem. 16). Mr. Cox's allegations, however, compare quite favorably with the allegations relator accepted by this Circuit in *U.S. ex. rel. Marlar v. BWXT Y-12,* LLC, 525 F.3d 439, 450 (6th Cir. 2008). Accordingly, as in *Marlar*, this Court should find that Mr. Cox has stated a viable cause of action under 31 U.S.C. §3730(h).

In *Marlar*, the District Court dismissed relator's Section (h) claim because it concluded that she did not allege facts from which "it could be inferred that [Defendant] knew that [Ms. Marlar] was considering bringing a qui tam action herself or assisting the government in bringing an FCA action." *Id*. at 449. The Sixth Circuit overturned this holding, stating that the district court's decision "impermissibly narrows the interpretation we have given 'protected activity.'" *Id*. To explain its conclusion, the Sixth Circuit recited the allegations that carried the day:

> She alleges that she observed purportedly fraudulent activity and confronted her employer about it. Specifically, Ms. Marlar told BWXT that she believed BWXT was receiving "illegal" "large incentive payments" under its contract with DOE because BWXT was "under-reporting [its employees'] work-related injuries and illnesses."

*Id*. at 450. Based upon these allegations, the Court stated, "[Marlar] therefore connected her complaint of BWXT's actions, under-reporting, to a concern about fraud on the federal government." *Id*. at 450. The court then stated:

> Given our interpretation of "protected activity" in McKenzie, Ms. Marlar has adequately pleaded that she "(1) [ ] engaged in a protected activity; (2) [that] his employer knew that he engaged in the protected activity; and (3) [that] his employer discharged or otherwise discriminated against the employee as a result of the protected activity."

*Id*. at 450 (internal citations omitted).

Like the relator in *Marlar*, Mr. Cox learned about purportedly fraudulent conduct by S&N and confronted his employer about it on multiple occasions. (Compl. at ¶ 63, 65, 68-69) These conversations alone "connected [relator's] complaint of [S&N's] actions, under-reporting, to a concern about fraud on the federal government." *Marlar*, 525 F.3d at 450. Defendant S&N then terminated Cox from employment in September 2008. (Compl. ¶ 71) These allegations more than adequately meet the standard for demonstrating that Mr. Cox's participation in protected activity, S&N's awareness of that participation, and a nexus between those elements and the adverse job action. *Marlar*, 525 F.3d at 450.

## IV.    CONCLUSION

For all the reasons above, this Court should deny Defendant's Motion to Dismiss.

Respectfully submitted this 16th day of June, 2010

    /s/
David W. Sanford, D.C. Bar No. 457933
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7777
Facsimile: (202) 742-7776
Email: dsanford@swhlegal.com

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT MORRIS**
1666 Connecticut Ave., NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776
Email: grantemorris@gmail.com

H. Vincent McKnight
**MCKNIGHT & KENNEDY, LLC**
8601 Georgia Avenue, Suite 1010
Silver Spring, MD 20910
Telephone: (301) 565-5281
Facsimile: (301) 565-5285
Email: vmcknight@mcknightandkennedy.com

Kevin H. Sharp
**DRESCHER & SHARP, PC**
1720 West End Ave., Ste. 300
Nashville, TN 37212

**Counsel for Plaintiff/Relator**