# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **SAMUEL ADAM COX, III,** | ) | |
| | ) | |
| **Plaintiff-Relator,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-2832** |
| | ) | |
| **SMITH & NEPHEW, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# ORDER DENYING DEFENDANT
## SMITH & NEPHEW, INC.'S MOTION TO DISMISS

Before the Court is Defendant Smith & Nephew, Inc.'s ("Smith & Nephew") April 13, 2010 Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim. (D.E. #18.) On June 16, 2010, Plaintiff-Relator Samuel Adam Cox, III ("Relator") filed a response in opposition. With leave of the Court, Smith & Nephew filed a reply on June 29, 2010. For the reasons stated herein, the Court **DENIES** Smith & Nephew's motion to dismiss.

## I. BACKGROUND

### A. Overview

On December 1, 2008, Relator filed this *qui tam* action on behalf of the United States government against Smith & Nephew under the Federal False Claims Act ("False Claims Act," "FCA," or "Act"), 31 U.S.C. §§ 3729 et seq., in the United States District Court for the Western District of Tennessee. Relator filed his complaint under seal

pursuant to 31 U.S.C. § 3730(b)(2), which requires FCA relators to file their initial complaints under seal and serve the United States government in accordance with Rule 4(d)(4) of the Federal Rules of Civil Procedure.  31 U.S.C. § 3730(b)(2).  After the United States notified the Court pursuant to 31 U.S.C. § 3730(b)(4)(B) that it declined to intervene in this litigation, the Court, by order dated February 11, 2010, unsealed Relator's complaint and directed Relator to effect service of process on Smith & Nephew. The next day Relator filed an amended complaint.  Relator's amended complaint seeks relief under the FCA both as the Act was written at the time of his employment with Smith & Nephew and as subsequently amended by the Fraud Enforcement Recovery Act ("FERA") signed into law on May 20, 2009.

**B. Allegations of Relator's Amended Complaint[1]**

According to Relator's amended complaint, Smith & Nephew is a British medical devices company with its headquarters in London, England that has sold medical devices to the United States government since at least 2002.  (Pl.'s Am. Compl. ¶ 14.)  Relator alleges that he worked in Smith & Nephew's Tennessee office as the company's Information Technology Global Director of Enterprise Resource Planning from mid-December 2007 until his termination in September 2008 and that in this capacity he learned that Smith & Nephew repeatedly sold and continues to sell products to the United States government in violation of federal procurement law—namely, the Federal Trade Agreements Act—by misrepresenting the items' country of manufacture.  (Id. ¶¶ 12-13, 15.)  Under the Federal Trade Agreements Act ("TAA"), 19 U.S.C. § 2502 et seq., the federal government is generally limited when making purchases in excess of a specified

---

[1] The following factual recitation is based upon the allegations of Relator's amended complaint.

amount to products manufactured in the United States or in certain designated countries. See 19 U.S.C. §§ 2503, 2511.  Relator contends that Smith & Nephew has violated and continues to violate the TAA by selling the United States government—in an amount exceeding the threshold for TAA applicability—products that were neither manufactured or "substantially transformed"[2] in the United States nor listed as "eligible products" manufactured or "substantially transformed" in one of the "designated countries" from which the federal government may also acquire products.

To this end, Relator identifies two contracts under which Smith & Nephew has made illegal sales.  The first is contract Number V797P-4403a by which Smith & Nephew was marketing 7,975 products to the Department of Veterans Affairs ("VA") as of January 20, 2010, and the other is the General Services Administration's ("GSA") Multiple Awards Schedule by which Smith & Nephew was marketing 7,801 products as of January 20, 2010 under contract Number V797P-4403A.  (Id. ¶¶ 28, 30-31.)  Relator alleges that these products are listed for sale to the government on either the VA's internet-based MedSurg Non-Pharmaceutical Catalogue or the GSA's Advantage website and that all of these products are either expressly labeled as made in the United States— the case with the products listed on GSA Advantage—or required to comply with the TAA—the case with the VA's catalogue.  (Id. ¶¶ 32-33.)  According to Relator, Smith & Nephew regularly purchases at least 107 of the products on the VA and GSA websites from Straits Orthopaedics, a Malaysian medical device manufacturer, even though Malaysia is not a designated country under the TAA.  (Id. ¶ 34; see id. ¶ 35 (citing Ex. 5 at 15 to Pl.'s Am. Compl. (VA document listing designated countries).)

---

[2] According to Federal Acquisition Regulation 25.003, "substantially transformed" generally means that the product has been changed "into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed."  FAR 25.003.

Relator's amended complaint alleges that Smith & Nephew imports products from Malaysia and then sells them to the United States government.  First, Smith & Nephew purchases the products from Strait Orthopaedics in Malaysia.  (Id. ¶ 38.)  Strait Orthopaedics then invoices Smith & Nephew from Vancouver, Canada but ships the products directly from Malaysia to one of Smith & Nephew's three warehouses in Memphis.  (Id. ¶ 40.)  Upon arrival in Memphis, the products are cleaned, sterilized, packaged, and stored until being shipped to Smith & Nephew's customers, including the federal government.  (Id. ¶ 41.)  As a result of the repackaging in Memphis, the products are never again identified as being of Malaysian origin; instead they are placed in boxes that bear Smith & Nephew's name and its addresses in Memphis and Tübingen, Germany.  (Id. ¶ 42.)  Even though Smith & Nephew is able to track the origin of any product by means of a "Material Document Number" assigned and stored in its computer system, Smith & Nephew makes no effort to track the country of origin for any given product after it arrives in Memphis, nor does Smith & Nephew keep products from non-designated countries (like Malaysia) separate from products that can be sold to the federal government under the TAA.  (Id. ¶¶ 43-45.)  Thus, according to Relator, Smith & Nephew's procedures obscure the Malaysian origins of the products it purchases from Straits Orthopaedics, which results in the improper sale of foreign-made goods to the federal government because Smith & Nephew nevertheless falsely certifies its compliance with the TAA and federal procurement law.  (Id. ¶¶ 46-48; see id. ¶¶ 49-55.)

Relator alleges that he came to have knowledge of Smith & Nephew's activities soon after he began working for the company in December 2007.  (Id. ¶ 56.)  In his amended complaint, Relator describes several meetings in which different high-level

executives acknowledged that Smith & Nephew was engaged in selling products to the federal government that failed to comply with federal procurement law and discussed these violations with Relator.  (Id. ¶¶ 57-60, 62-63, 65-66, 68.)  Specifically, Relator alleges that Sal Chiovari, Smith & Nephew's Chief Information Officer, and Jon Schauber, Smith & Nephew's Global Vice President of Information Technology, both recognized the illegality of the company's sales but nevertheless prevented Relator from taking steps to address issues surrounding the company's false certifications of compliance with the TAA, though the two executives—for unknown reasons—later directed Relator to undertake a project investigating the countries of origin for various Smith & Nephew products.  (Id. ¶¶ 61, 65, 67.)

Relator's amended complaint further details Relator's participation in a March 2008 meeting with several other individuals from Smith & Nephew—including the Senior Vice President of Global Orthopedic Operations—at which the attendees discussed various devices to conceal Smith & Nephew's sales of non-TAA compliant products to the government.  (Id. ¶ 68.)  When Relator refused to assist in the perpetuation of Smith & Nephew's illegal activities, Relator asserts, he was berated and cursed by Mr. Chiovari and threatened by Mr. Schauber.  (Id. ¶ 69.)  Relator states that he then reported what he knew to Smith & Nephew's whistleblower hotline.  (Id. ¶ 70.)  Relator contends that Smith & Nephew terminated his employment in September 2008 in retaliation for refusing to participate in and for attempting to end Smith & Nephew's illegal conduct.  (Id. ¶ 71.)

## II. LEGAL STANDARD

Smith & Nephew moves for dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction in addition to moving for dismissal under 12(b)(6) for failure to state a claim.

### A. Motion to Dismiss under Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure asserts that the court lacks subject matter jurisdiction.  The motion may challenge the sufficiency of the complaint itself—in which case it constitutes a facial attack—or it may challenge the factual existence of subject matter jurisdiction—in which case the motion constitutes a factual attack.  United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  In ruling upon a facial attack, the court must take as true the allegations of the plaintiff's complaint and construe them in the light most favorable to the plaintiff, but in a factual attack, the court does not presume that the complaint's allegations are true and instead considers other evidence bearing upon the question of subject matter jurisdiction.  DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).  When faced with a factual attack, the trial court may, at its discretion, consider affidavits and documents and even conduct a limited evidentiary hearing to resolve any disputes as to jurisdictional facts.  Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990).  The plaintiff bears the burden of proving jurisdiction on a motion to dismiss under Rule 12(b)(1).  Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986); see United Gov't Sec. Officers of Am. v. Akal Sec., Inc., 475 F. Supp. 2d 732, 736 (S.D. Ohio 2006).

**B. Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure only tests whether a cognizable claim has been pled.  Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).  To determine whether a motion to dismiss should be granted, the court examines the complaint, which must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  See Fed. R. Civ. P. 8(a)(2).  It must also provide the defendant with fair notice of the plaintiff's claim as well as the grounds upon which it rests.  Conley v. Gibson, 355 U.S. 41, 47 (1957); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976).  While the complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007); see also Scheid, 859 F.2d at 436-37.

Likewise, the complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555 (citation omitted).  The mere possibility that some set of undisclosed facts will support recovery is insufficient to overcome a 12(b)(6) challenge.  Twombly, 550 U.S. at 561; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").  On a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations made in the complaint and construes them in the light most favorable to the plaintiff.  Neitzke v. Williams, 490 U.S. 319, 326-27 (1989); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295-96 (6th Cir. 2008); Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983).  The court,

however, only takes as true well-pled facts, and it will not accept legal conclusions or unwarranted factual inferences.  Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 405-06 (6th Cir. 1998); see Iqbal, 129 S. Ct. at 1949.

## III. ANALYSIS

### A. Overview of the False Claims Act

Enacted during the Civil War as a tool to uncover and discourage fraud by military contractors, the False Claims Act enables a private citizen to file a *qui tam*[3] suit as a private attorney general on behalf of the United States against certain parties— particularly government contractors—who defraud the United States government.  See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1153 (3rd Cir. 1991).  To provide an incentive for *qui tam* suits, the FCA allows the successful private party or "relator" to receive a portion of the money recovered on the government's behalf.  See, e.g., 31 U.S.C. § 3730(d) (establishing amount of awards for *qui tam* relators).

"The language of the original False Claims Act permitted a private relator to initiate suit even though that private individual contributed nothing to the exposure of the fraud alleged."  United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1497 (11th Cir. 1991).  This regime proved too permissive for Congress because it allowed "parasitical" lawsuits based on information copied from government files and indictments.  Id.  Therefore, in 1943, Congress erected the "government knowledge bar" by amending the FCA to disallow a relator from bringing suit if the government

---

[3] "'*Qui tam*' is an abbreviation for the Latin phrase '*qui tam pro domino rege quam pro si ipso in hac parte sequitur*,' meaning 'Who sues on behalf of the King as well as for himself.'"  United States ex rel. Jones v. Horizon Healthcare Corp., 160 F.3d 326, 329 n.1 (6th Cir. 1998) (quoting Black's Law Dictionary 1251 (6th ed. 1990)).

possessed prior knowledge of the allegations, even if the relator's knowledge was independent and distinct from the information in the government's possession. Id.; see U.S. ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999) ("The implicit logic of the pre-1986 law was that if the government had the relevant information before the plaintiff initiated suit, then the government . . . [did not] . . . need the assistance of private parties to ferret them out.  And if the government knew about the information yet did nothing, then the government probably thought the suit meritless[.]"). Because the government knowledge bar proved too restrictive, Congress again amended the FCA in 1986 to encourage more *qui tam* suits.  Williams, 931 F.2d at 1497-98.  The 1986 amendments eliminated the broad government knowledge bar and replaced it with language permitting any person to file a *qui tam* action subject to four express exceptions.[4]  Id. at 1498.  Congress further amended the FCA in 2009 and again in 2010,

---

[4] As amended in 1986, the FCA created four exceptions as follows:

> (e) Certain Actions Barred. –
>
> (1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.
>
> (2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.
>
> (B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in section 201(f) of the Ethics in Government Act of 1978 (5 U.S.C.App.).
>
> (3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.
>
> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a

and the effect of those amendments is discussed below insofar as they are relevant to this case.

**B. The Public Disclosure Bar**

    *1. The Current and Former Versions of § 3730(e)(4)(A)*

      The exception at issue in the instant case is the "public disclosure bar," which generally precludes private suits based on information disclosed in particular settings— such as hearings, government reports, or news reports—unless the relator meets the definition of an "original source" under the FCA.[5]  Prior to its recent amendment, the FCA's public disclosure bar read as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing,

---

> criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Williams, 931 F.2d at 1498 (quoting 31 U.S.C. § 3730(e) (1988)).

[5] Since the 2010 amendments, "an original source" has been defined as

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B) (2010).  Prior to the 2010 amendments, the FCA defined an original source as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2009).

> in a congressional, administrative, or Government[6]
> Accounting Office report, hearing, audit, or investigation,
> or from the news media, unless the action is brought by the
> Attorney General or the person bringing the action is an
> original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2009); see United States ex rel. Poteet v. Medronic, Inc., 552

F.3d 503, 514 (6th Cir. 2009) ("Any action based even partly upon public disclosures will

be jurisdictionally barred.") (internal quotation marks omitted).   As a result of the

President's signing into law the Patient Protection and Affordable Care Act, Pub. L. 111-

148, 124 Stat. 119, on March 23, 2010, the FCA's public disclosure bar now reads:

> The court shall dismiss an action or claim under this
> section, unless opposed by the Government, if substantially
> the same allegations or transactions as alleged in the action
> or claim were publicly disclosed—
>
> > (i)     in a Federal criminal, civil, or administrative
> >         hearing in which the Government or its
> >         agent is a party;
> > (ii)    in a congressional, Government
> >         Accountability Office, or other Federal
> >         report, hearing, audit, or investigation; or
> > (iii)   from the news media,
>
> unless the action is brought by the Attorney General or the
> person bringing the action is an original source of the
> information.

31 U.S.C. § 3730(e)(4)(A)(i)-(iii) (2010).   The major changes effected by the 2010

amendments to the FCA are to clarify that the public disclosure bar only applies if the

"criminal, civil, or administrative hearing" at which disclosure occurred was a federal

proceeding and to make the bar applicable only if the United States government or its

---

[6] Annotations to the statute note that at the time of the provision's enactment the word "Government" should probably have been "General" and thereby refer to the General Accounting Office. See 31 U.S.C.A. § 3730(e)(4)(A) at n.2 (West 2008).  Because the name of the General Accounting Office was changed to the Government Accountability Office in 2004, see Pub. L. 108-271, 118 Stat. 811 (2004), use of the term "Government" in the language enacted in 2009 is correct.  See 31 U.S.C.A. § 3730(e)(4)(A)(ii) at n.2 (West 2009).

agent was a party to that hearing.  Moreover, the amendment adds that the bar does not apply if the government opposes dismissal of the action.  Furthermore, Congress changed the language of this provision to state that a case based upon certain information must be dismissed rather than allowing the section to continue to state that "[n]o court shall have jurisdiction" over such cases.[7]

Smith & Nephew contends that because the 2010 amendments are not expressly retroactive, only the prior version of § 3730(e)(4) applies to this case.  Relator does not specifically respond to Smith & Nephew's contention, but his amended complaint asserts that Smith & Nephew's violations of federal procurement law are of a continuing nature, leaving open the possibility that they continued past March 23, 2010 and to the present. Because the recent amendments do not lead to a different conclusion as to whether self-reporting to the federal government qualifies as "public disclosure" for purposes of the FCA's public disclosure bar, the Court's analysis will focus on former § 3730(e)(4), but will also address the effect of the current language on Relator's claims.[8]

---

[7] The new language additionally states that the bar applies when "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A) (2010). Thus, Congress abandoned the prior language, which had stated that the bar applied when the relator's allegations were "based upon" the public disclosures.  The Sixth Circuit—like several other circuits—interpreted "based upon" to mean "supported by" and thereby "preclude[d] individuals who base any part of their allegations on publicly disclosed information from bringing a *qui tam* action."  United States ex rel. McKenzie v. BellSouth Telecomm., Inc., 123 F.3d 935, 940-41 (6th Cir. 1997); see also Jones, 160 F.3d at 336 (Gilman, J., concurring) ("I find that the interpretation rendered by McKenzie and the other circuits cited in the majority opinion, to the effect that 'based upon' means 'supported by,' to be an unnatural contortion of the language to reach a result that is not fairly supported by the statute itself.").  Relator does not contest Smith & Nephew's contention that Relator's claims are "based upon" the information Smith & Nephew disclosed to the government, and neither party contends that the 2010 change altering the "based upon" language has any effect on this suit.

[8] The U.S. Supreme Court's recent decision in Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson—an opinion issued shortly after the amended language became law—observed that the new version of § 3730(e)(4) should not be considered to have retroactive application, at least insofar as the new language eliminates a claimed defense.  130 S. Ct. 1396, 1400 n.1 (2010).

### *2. Whether Self-Reporting to the Government Constitutes "Public Disclosure"*

Relator does not challenge Smith & Nephew's assertion that, prior to the filing of this lawsuit, Smith & Nephew made certain disclosures to responsible officials within the United States government regarding its compliance with federal procurement law. Specifically, Smith & Nephew represents that in September 2008 it wrote to the Department of Defense Inspector General and to the Veterans Affairs National Acquisition Center voluntarily disclosing that Smith & Nephew had supplied products to the Defense Department and VA that were manufactured in Malaysia, China, and Thailand and thus failed to comply with the federal procurement law. The letters also acknowledged that Smith & Nephew may have supplied incorrect certifications in connection with three Defense Department contracts and four contracts with the VA in addition to the fact that some Smith & Nephew products were sold to the government through third-party resellers under two other contracts. Smith & Nephew identified Malaysian manufacturer Straits Orthopaedics as the maker of some of the products at issue and stated as well that some commingling of compliant and non-compliant products marketed to the VA had occurred such that it could no longer determine whether goods from non-designated counties like Malaysia had actually been supplied to the government. In November 2008, the Department of Defense wrote Smith & Nephew notifying the company that, with the concurrence of the U.S. Department of Justice, it was referring the matter to the VA.[9]

---

[9] A motion to dismiss an FCA action on the grounds that the public disclosure bar preludes the relator's suit is brought pursuant to Rule 12(b)(1), which allows the Court to consider matters outside of the pleadings. E.g., United States ex rel. J. Coopers & Assocs. v. Bernard Hodes Group, Inc., 422 F. Supp. 2d 225, 232-33 (D.D.C. 2006).

Smith & Nephew contends that its voluntary disclosures to the government constitute "public disclosures" under the FCA, which in turn bar Relator's suit, since Relator concedes he does not qualify as an "original source" under the Act. Relator responds that Smith & Nephew's disclosures do not fall within the statutory definition of "public disclosures" that defeat the claims of a non-original source relator.

Smith & Nephew urges the Court to follow the Seventh Circuit, which has adopted the position that "[d]isclosure of information to a competent public official about an alleged false claim against the government . . . [is] . . . public disclosure within the meaning of § 3730(e)(4)(A) when the disclosure is made to one who has managerial responsibility for the very claims being made." United States ex rel. Mathews v. Farmington, 166 F.3d 853, 861 (7th Cir. 1999); accord United States ex rel. Fowler v. Caremark RX, L.L.C., 496 F.3d 730, 736-37 (7th Cir. 2007). In adopting this reading, the Seventh Circuit explained that "a public official in his official capacity is authorized to act for and to represent the community, and . . . disclosure to the public official responsible for the claim effectuates the purpose of disclosure to the public at large . . . ." Farmington, 166 F.3d at 851. In a subsequent case, the Seventh Circuit expanded on this holding and found that "disclosure of information to the U.S. Attorney's Office during the government's investigation of . . . [the defendant's] . . . business practices qualifies as a public disclosure of the [r]elators' allegations . . . [because] . . . [t]he U.S. Attorney is the primary legal representative of the United States within his or her respective district, 28 U.S.C. § 547, and would be the public official responsible for bringing criminal or civil claims against . . . [the defendant] . . . on this issue." Caremark RX, 496 F.3d at 736-37.

Relator asserts that the Sixth Circuit case of <u>United States ex rel. Burns v. A.D.</u> <u>Roe Co.</u>, 186 F.3d 717 (6th Cir. 1999), conclusively forecloses adoption of the Seventh Circuit's view.  In <u>A.D. Roe</u>, the court of appeals stated, "[T]he public disclosure must be of 'allegations or transactions' in particular settings, such as hearings, reports, investigations, or news.  The *qui tam* action will not be barred because of public disclosure unless all of the elements of the jurisdictional bar are present."  186 F.3d at 724.  The Court does not share Relator's opinion about the relevance of this language from <u>A.D. Roe</u>.  Although <u>A.D. Roe</u> does state that the public disclosure bar is limited to disclosures made "in particular settings," courts do not strictly interpret the public disclosure bar.  For instance, the Sixth Circuit has joined other circuits in concluding that the term "public disclosure" as used in the FCA "includes documents that have been filed with a court, such as discovery documents and a plaintiff's complaint[,]" even though the statute mentions judicial "hearings" rather than "filings."  <u>United States ex rel. McKenzie</u> <u>v. BellSouth Telecomm., Inc.</u>, 123 F.3d 935, 939 (6th Cir. 1997) (citing <u>Federal</u> <u>Recovery Servs., Inc. v. United States</u>, 72 F.3d 447, 450 (5th Cir.1995) and <u>United States</u> <u>ex rel. Springfield Terminal Ry. Co. v. Quinn</u>, 14 F.3d 645, 652 (D.C. Cir. 1994)).  Similarly, the United States Supreme Court recently refused to restrict the term "administrative" to merely federal administrative hearings, instead finding that disclosures made in state or local administrative hearings are sufficient to invoke the public disclosure bar.  <u>Graham Cnty. Soil and Water Conservation Dist. v. United States</u> <u>ex rel. Wilson</u>, 130 S. Ct. 1396, 1411 (2010).   More importantly, however, <u>A.D. Roe</u> did not involve a defendant's voluntary disclosure of potential wrongdoing to responsible government officials, and there is no indication that the court in <u>A.D. Roe</u> intended to

address disclosures made to the government without further dissemination.  Nor has any other case from the Sixth Circuit Court of Appeals addressed this issue, which leaves the Court to determine the question as a matter of first impression.

Unlike the Seventh Circuit, courts of appeals in other circuits have declined to hold that a defendant's disclosures to responsible government officials qualify as public disclosures capable of triggering the public disclosure bar.  See United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 730-31 (1st Cir. 2007) (citing cases from the Ninth, Tenth, and Eleventh Circuits rejecting the notion that knowledge by the government satisfies the public disclosure bar), abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662 (2008).  In United States ex rel. Rost v. Pfizer, Inc., the First Circuit directly considered the authority from the Seventh Circuit and declined to follow it, thereby holding that disclosure to the government—even to those officials responsible for the claim—does not satisfy the public disclosure bar.  507 F.3d at 727-731.  Rejecting the same argument from a *qui tam* defendant that Smith & Nephew advances in the instant case, the court in Rost first reasoned that equating "government" with "public" is at odds with the ordinary understanding of those terms and also inconsistent with the FCA as a whole, which "uses the term 'Government' numerous times and does not once equate the government with the public."  Rost, 507 F.3d at 729.  The court further found that such a reading is contrary to the intent of Congress in enacting the 1986 amendments to the FCA which, among other things, broadened the class of potential plaintiffs and eliminated the government knowledge bar, which had prevented courts from exercising "jurisdiction over *qui tam* actions 'based on evidence or information the Government had when the action was brought.'"  Id. at 730 (quoting

United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 19 n.1 (1st Cir. 1990)).   By eliminating this bar, Congress sought to increase private enforcement of the FCA and "help keep the government honest in its investigations and settlements with industry." Id. Indeed, the Rost court concluded that the rule urged by the defendant would effectively reinstate the government knowledge bar and thus defeat an objective of the 1986 amendments.[10]

The Court finds the First Circuit's analysis in Rost to be persuasive and likewise declines to adopt the Seventh Circuit's rule.   Rather, the Court agrees with the First Circuit's statement in Rost that allowing disclosure to competent government officials to substitute for disclosure to the public at large would be tantamount to reviving the government knowledge bar Congress removed in 1986.   Acceptance of Smith & Nephew's position would also, as stated in Rost, conflate the statute's use of "government" and "public" without any textual basis indicating that Congress intended the two terms to be used interchangeably.   Accordingly, the Court finds that the public disclosure bar does not provide a basis for dismissal of Relator's suit.

### C. Sufficiency of Relator's Pleadings as to Alleged § 3729(a) Violations

Smith & Nephew next argues that Relator's amended complaint must be dismissed under Rule 12(b)(6) because Relator failed to plead his allegations of fraud with particularity as required by Federal Rule of Civil Procedure 9(b).   Rule 9(b) of the Federal Rules of Civil Procedure states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P.

---

[10] The opinion of the court of appeals in Rost echoed the reasoning of the district court, and the appellate court expressly adopted the district court's analysis on this issue as further support for its rejection of the Seventh Circuit's standard.   See Rost, 507 F.3d at 731 (adopting in pertinent part the reasoning of United States ex rel. Rost v. Pfizer, Inc., 446 F. Supp. 2d 6, 16-18 (D. Mass. 2006)).

9(b).  While Rule 9(b) is said to impose a particularity requirement on allegations of fraud, this requirement must be understood in conjunction with the liberal pleading standard established by Rule 8(a)(2).  See Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988); see generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298, at 183-262 (3d ed. 2004).  Rule 9(b)'s purpose "is to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud."  Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999) (citing Michaels Bldg. Co., 848 F.2d at 679).  Courts, however, are more lenient in those situations where the alleged fraud did not occur at a discrete time and place and instead "the transactions involved are complex or cover a long period of time."  In re Eli Lilly & Co., Prozac Prods. Liab. Litig., 789 F. Supp. 1448, 1456 (S.D. Ind. 1992) (quoting 2A James William Moore et al., Moore's Federal Practice ¶ 9.03[1], at 9-29 (1991)); see U.S. ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) ("[I]t has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied.") (citing several cases).

Smith & Nephew contends that Relator's amended complaint fails to show that the company actually—as opposed to hypothetically—submitted a false claim for payment to the government.  According to Smith & Nephew, Relator's allegations amount to little more than a contention that the company "in all likelihood" made a false claim to the government, which is insufficient to satisfy Rule 9(b)'s heightened pleading standard.  Simply describing a fraudulent scheme, Smith & Nephew argues, is not sufficient because Rule 9(b) requires the complaint to identify the specific false claims

submitted and invariably compels the relator "at a minimum . . . [to] . . . 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"   United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)) ("Bledsoe I").  Relator responds that his amended complaint alleges his causes of action with sufficient particularity because Rule 11(b)(3) and case law create a flexible standard of pleading when the complaint demonstrates that it is reasonable to conclude the evidence to support its allegations will likely be uncovered by further investigation or discovery.

Smith & Nephew primarily relies upon the Sixth Circuit's opinion in United States ex rel. Bledsoe v. Community Health Systems, Inc., a case in which the court clarified that "[a] relator cannot meet this [Rule 9(b)] standard without alleging which specific false claims constitute a violation of the FCA."  501 F.3d 493, 505 (6th Cir. 2007) ("Bledsoe II").  In reaching this holding, the court rejected the plaintiff-relator's "claim that he need only allege a false scheme, rather than specific false claims[.]"  Id. at 505 n.13.  The Court, however, agrees with Relator that his allegations do not fall short of the standard established by the Sixth Circuit in Bledsoe II.[11]  Relator's amended complaint contains significant detail, including the contracts under which the allegedly illicit sales occurred and the items that are allegedly labeled falsely.  Relator does not point to the specific dates of the improper transactions or such details as serial or tracking

---

[11] The court in Bledsoe II also left open the possibility that Rule 9(b) should be applied flexibly "where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator." Bledsoe II, 501 F.3d at 504 n. 12.

numbers for falsely designated products sold to the government, but to require such information in the present case would demand an omniscience that cannot reasonably be expected of a relator's complaint.  Indeed, the scheme alleged is so expansive and involved that Relator cannot fairly be expected to identify every fraudulent act it entails. Nevertheless, Relator's amended complaint provides information satisfactorily detailing Smith & Nephew's allegedly fraudulent conduct. See United States ex rel. Ebeid v. Lungwitz, 616 F.3d 993, 998-99 (9th Cir. 2010); United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190-91 (5th Cir. 2009); see, e.g., United States ex rel. Pogue v. Am. Healthcorp, Inc., 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997) (finding complaint sufficient that provided "no specific dates or . . . employees are identified, . . . [but that alleged]. . . that the hospital participated in a systematic, fraudulent scheme, spanning the course of twelve years[.]").   Relator's allegations are even less speculative because they are based on his first-hand knowledge as an executive with Smith & Nephew—an executive who was, for a time, tasked by Smith & Nephew with investigating falsely designated products and who allegedly had other executives admit to him that Smith & Nephew was engaged in violations of federal procurement law.   Therefore, having reviewed the allegations of Relator's amended complaint in light of the relevant authority, the Court finds that Relator has pled each of his causes of action with sufficient particularity to withstand a Rule 12(b)(6) motion to dismiss.[12]

---

[12] Relator's response in opposition to Smith & Nephew's motion to dismiss addresses specifically how Relator's amended complaint sufficiently pleads causes of action under both § 3729(a)(1)(A) and former § 3729(a)(1) in addition to both § 3729(a)(1)(B) and former § 3729(a)(2).   The Court does not find it necessary to discuss the applicable pleading standard as to each of Relator's individual causes of action because it finds the allegations of the amended complaint are sufficiently particular for all of these claims.

**D. Relator's Wrongful Discharge/Retaliation Claim (former § 3730(h))**

Finally, Smith & Nephew argues for dismissal of Relator's claim under former § 3730(h), which generally provides relief for an employee who is discharged or suffers other adverse employment action because of lawful actions taken by the employee "in furtherance of other efforts to stop [one] or more violations" of the FCA.  31 U.S.C. § 3730(h) (2008).[13]  "For a retaliation claim to be successful, the plaintiff must show that she was engaged in a protected activity and that her employer knew about it."  BellSouth Telecomm., 123 F.3d at 944.  The employee's action must have been sufficient to give the employer reason to believe the employee was contemplating a *qui tam* action.  Id. at 944-45.

Smith & Nephew contends that Relator's actions were largely passive and consisted of simply being informed about the company's violations of the law, but that Relator did not undertake affirmative steps to report, investigate, or prevent any legal violations by Smith & Nephew.  The three allegations of affirmative conduct by the Relator described in his amended complaint are insufficient, Smith & Nephew argues, because they could at most be considered reports to superiors of potential regulatory violations and thus do not qualify as protected activity.

The Court, however, agrees with Relator that the type of conduct described in his amended complaint is substantially similar to that found by the Sixth Circuit to constitute protected activity in United States ex rel. Marlar v. BWXY Y-12, L.L.C., 525 F.3d 439 (6th Cir. 2008).  Reversing the district court's dismissal of the plaintiff-relator's § 3130(h) claim, the court of appeals in Marlar stated:

---

[13] FERA amended § 3730(h) effective May 20, 2009, but the change was not retroactive.  Thus, former § 3730(h) is the relevant provision for the instant case.

> [The plaintiff-relator] . . . alleges that she observed purportedly fraudulent activity and confronted her employer about it. Specifically, . . . [the plaintiff-relator] . . . told BWXT that she believed BWXT was receiving "illegal" "large incentive payments" under its contract with DOE because BWXT was "under-reporting [its employees'] work-related injuries and illnesses." She therefore connected her complaint of BWXT's actions, under-reporting, to a concern about fraud on the federal government. [The plaintiff-relator] . . . further alleges in her complaint that because she informed BWXT of her concerns, she was terminated. [The plaintiff-relator] . . . has adequately pleaded that she "(1) [ ] engaged in a protected activity; (2) [that] h[er] employer knew that he engaged in the protected activity; and (3) [that] h[er] employer discharged or otherwise discriminated against the employee as a result of the protected activity."

Id. at 450 (internal citations omitted and pronouns altered) (quoting Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 556 (6th Cir. 2003)). The same characterization fairly applies to the actions of Relator, as described in his amended complaint, prior to Smith & Nephew's termination of his employment in September 2008. Moreover, the Court disagrees with Smith & Nephew's characterization of Relator's actions as largely passive. To the contrary, the amended complaint alleges a series of actions by Relator expressing his concerns about the company's false labeling of products and seeking to have those problems ameliorated. Therefore, the Court finds that Relator's amended complaint sufficiently alleges a cause of action for retaliation under former § 3730(h).

## IV. CONCLUSION

For the reasons stated above, Smith & Nephew's motion to dismiss is **DENIED**.

**IT IS SO ORDERED**, this the 4th day of November, 2010.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**